# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.   CRIMINAL ACTION NO. 2:21-cr-00026

MARKEIS WOMACK

## MEMORANDUM OPINION & ORDER

Before the Court is Defendant Markeis Womack's Motion to Suppress Evidence seized by the Jackson County Sheriff's Department in a warrantless automobile search [ECF No. 29]. I have considered Mr. Womack's Motion and Memorandum in Support [ECF No. 30], the Government's Response in Opposition [ECF No 31], the testimony and arguments heard at the June 21, 2021 pre-trial motions hearing, and the supplemental briefing I ordered the parties to submit at the conclusion of that hearing. [ECF Nos. 37, 38]. For the reasons contained in this memorandum opinion, the Motion is **GRANTED**.

### I. BACKGROUND

On the evening of May 24, 2020, Markeis Womack ("Womack") was driving south along Route 68 in Ravenswood, West Virginia near the Ritchie Bridge. At the same time, Jackson County Sheriff's Deputy J.B. Thompson was stationed in his patrol car on Route 68 where he was watching traffic and conducting drug interdiction. As Womack passed the stationed patrol car, Deputy Thompson observed that Womack was driving in a way that he characterized as "hiding." Deputy

Thompson reported that Womack had his seat reclined and his arms locked out straight in front of him as if he were bracing for impact. Deputy Thompson also observed that Womack's gold Chevrolet HHR had Michigan license plates. Deputy Thompson noted that in his training and experience doing drug interdiction, Route 68 is a drug artery for Ohio and Michigan traffickers. Armed with that knowledge and his suspicions based on Womack's unusual posture, he decided to follow Womack as he turned left off of Route 68 onto a four-lane highway. After following him for a short distance, Deputy Thompson testified that he saw Womack commit two separate traffic violations: first, Womack changed lanes from left to right without putting on his turn signal; second, Womack briefly crossed the white fog line on the right-hand side of the road that divides the road from the shoulder.

Deputy Thompson decided to initiate a traffic stop. As he approached the car and began speaking with Womack, Deputy Thompson testified that he could smell the odor of burnt marijuana. At the pretrial motions hearing, Deputy Thompson testified that Womack seemed extremely nervous, that his hands were trembling and that he was having trouble speaking as if he had dry mouth. When questioned by Deputy Thompson during the traffic stop, Womack informed Deputy Thompson that he was on his way to Danville to visit his parents. Deputy Thompson did a check of Womack's license and registration which returned no outstanding warrants or criminal history. Shortly after Deputy Thompson began his traffic stop of Womack, Patrolman Colby Bush of the Ravenswood Police Department arrived at the scene and conferred with Deputy Thompson. Officer Bush testified that Deputy Thompson told him "I think I've got a good one," meaning that he believed that Womack might

be involved in drug running or other illegal activity. Officer Bush questioned Womack and echoed the Deputy's testimony that Womack was highly nervous. Officer Bush stated that Womack said that he was on his way to see his aunt in Charleston and that he could also smell marijuana in the car.

Deputy Thompson informed Womack that he intended to search his Chevrolet. Womack became agitated as the two officers placed him in custody and patted him down for weapons. Upon searching the vehicle, the officers discovered a package containing nearly 500 grams of heroin.

Womack moves to suppress the fruits of the warrantless search. First, he argues that that Deputy Thompson illegally initiated a traffic stop. And second, he argues that even if the traffic stop itself was proper, the officers did not have probable cause to search the car.

## II. DISCUSSION

The Fourth Amendment states in relevant part "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Supreme Court has repeatedly held that "searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 374 (U.S. 1993). "The exclusionary rule 'generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights.'" *United States v. Stephens*, 764 F.3d 327, 335 (4th Cir. 2014) (*quoting Penn. Bd. of Prob. & Parole v.*

*Scott*, 524 U.S. 357, 359, (1998)). At a suppression hearing, the Government bears the burden of proving by a preponderance of the evidence that a warrantless search did not violate the Fourth Amendment. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

A vehicle stop is a seizure within the ambit of the Fourth Amendment. An officer may initiate a traffic stop on either of two grounds. First, the officer's decision to stop a car is reasonable if he has probable cause to believe that a traffic violation has taken place. *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018). Stops are analyzed under an objective test, which asks whether a reasonable officer would have stopped the car for a traffic violation, even if he would not have done so but for his suspicions of other criminal activity. *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). Such a limited detention does not become "unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity," as long as the stop was justified at its inception. *Id*. In other words, the law allows for pretextual traffic stops; the pretext must be based on an actual traffic violation.

Second, an officer may initiate a traffic stop on the basis of a reasonable suspicion that criminal activity is afoot, even in the absence of probable cause. Such investigatory stops must be supported with "articulable facts indicative of criminal misconduct." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000). While reasonable suspicion is a lower bar for an investigating officer to clear than probable cause, "[t]he officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Terry v. Ohio*, 392 U.S. 1, 27 (1968). In

evaluating the validity of a stop supported only by reasonable suspicion, the court must evaluate the totality of the circumstances including the information that was known to the detaining officer at the time of the stop. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). In some rare circumstances, even wholly lawful conduct may engender a reasonable suspicion that criminal activity is afoot. *See Sokolow*, 490 U.S. at 9–10 (observing that "Terry itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation'" (quoting Terry, 392 U.S. at 22)). So long as "[t]he articulated factors together . . . serve to eliminate a substantial portion of innocent travelers," the reasonable suspicion standard may be satisfied. *See United States v. Foreman,* 369 F.3d 776, 781 (4th Cir. 2004).

Our Court of Appeals has succinctly explained the key difference between the probable cause and reasonable suspicion standards: "probable cause looks for past or present illegalities" whereas the main function of the reasonable suspicion standard as announced in *Terry* is "to grant officers the ability to prevent future wrongdoing." *United States v. Perkins*, 363 F.3d 317, 326–27 (4th Cir. 2004).

Once an officer has initiated the traffic stop, probable cause may develop in the course of the stop to search the interior of the vehicle without a warrant. *See United States v. Haley*, 669 F.2d 201, 203 (4th Cir. 1982). "Sufficient probable cause arises when the officers smell marijuana inside the vehicle." *Id.* (quoting *United States v. Sifuentes*, 504 F.2d 845 (4th Cir. 1974)).

In this case, both officers testified that there was an odor of burnt marijuana emanating from Womack's vehicle. Womack testified that he has never smoked

5

marijuana due to his asthma and that he never allows anyone to smoke marijuana in his vehicle. Determining whether the officers had probable cause for the warrantless search would require weighing the credibility of the officers versus the defendant and making a factual determination. However, because this motion can be decided on the grounds of whether the traffic stop was valid at its inception, I do not need to do this here.

To determine the validity of the traffic stop, I must examine whether it was reasonable under the Fourth Amendment—either because it was supported by probable cause that a traffic offense had been committed or because he had reasonable suspicion that criminal activity was afoot. I find that under either standard, the initiation of the traffic stop was an unreasonable seizure.

### A. Did Womack's purported traffic violations create probable cause to initiate a vehicle stop?

The Government contends that Deputy Thompson observed Womack commit two distinct violations of West Virginia traffic law. The Government argues that either of these violations suffice to create probable cause to pull him over. I disagree.

    i.    *Failure to signal before changing lanes*

The first supposed infraction occurred when Deputy Thompson followed Womack as he turned left off of Route 68 onto the four-lane highway. Deputy Thompson testified that he was following fairly close behind Womack, at a distance of perhaps 10 to 12 feet in his estimation. Womack moved over to the right lane, which Deputy Thompson believed to be—and the Government argues to be—a violation of W.Va. Code § 17C-8-8. This section provides: "No person shall turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event

6

any other traffic may be affected by such movement." W.Va. Code § 17C-8-8. This statute has been interpreted to mean that a motorist must use a turn signal during "those occasions where others could be affected by the turning vehicle." *Clower v. W. Va. Dep't of Motor Vehicles*, 678 S.E.2d 41, 46 (2009). "'[F]ailure to signal alone is not sufficient to warrant a traffic stop; rather, traffic must also be affected by the movement of the motorist's vehicle.'" *United States v. Rucker*, Case No. 1:19-00308-001, 2019 U.S. Dist. LEXIS 232944 (S.D. W. Va. Aug. 18, 2020) (quoting *Teas v. McCallen*, 2013 U.S. Dist. LEXIS 77624, 2013 WL 2422783, at *10 (N.D. W. Va. June 3, 2013)). Here, Deputy Thompson testified that he was following closely behind Womack and that there were no other cars on the road. Defendant's counsel elicited cross-examination testimony from Deputy Thompson which revealed that neither the Deputy himself nor any other car was affected by the movement of Womack's car from one lane to the other. I am not satisfied that the Government has shown Womack's lane change was a violation of the West Virginia code because there is insufficient evidence in the record to find that Womack's lane change affected traffic. Thus, I cannot find that Deputy Thompson lawfully based his traffic stop upon his observation that Womack changed lanes without the use of a turn signal.

    ii.    *Crossing the fog line*

Next, the Government submits that Womack's crossing of the solid line that separates the main road from the shoulder was a violation of the West Virginia law which states that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane of travel and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." W. Va. Code § 17C-7-9. In

7

this case, Deputy Thompson states that he observed one instance of Womack touching or crossing the line with his car. It is not self-evident to me that a single instance of crossing the shoulder or fog line is a traffic violation. The plain language of the statute ("as nearly as practicable") leaves drivers with some margin of error to cross a line without being in immediate violation of the law or giving police officers probable cause to initiate a traffic stop—pretextual or otherwise. A single fog line crossing, without more (e.g., speeding, erratic driving or swerving), is a slender reed on which to lean.

I am aware that Fourth Amendment jurisprudence has evolved over the decades to adopt the concept of the pretextual stop in which an officer detains a person or a vehicle on the nominal basis of some minor offense because he holds the ulterior belief that greater criminality is brewing. *See Hassan El*, 5 F.3d 726 (4th Cir. 1993). What I cannot accept is the notion that a person's Fourth Amendment rights are adequately safeguarded when officers stack pretext on top of pretext. That is to say, that if an officer is to make a pretextual investigative stop, he may not claim to have obtained probable cause unless there is an actual instance of breaking the law.

I am troubled by the fog line issue because it offers patrolling officers such a powerful and unfalsifiable wedge with which to detain drivers, question them about their destinations, smell the interiors of their cars, and even ask them to consent to pat downs and warrantless searches. It is nearly impossible for a driver to dispute that he crossed a fog line on any one instance. Here, Deputy Thompson testified that two of the major reasons for his deciding to follow Womack in the first place were his Michigan license plates and his knowledge that Route 68 connects to Route 33, which

is a path well-beaten with the tracks of drug lords and their pawns from Ohio and Michigan. The incidental fog line crossing gave the Deputy a foot in the door to follow up his suspicions and discover the drugs hidden in Womack's car. Deputy Thompson's intuition happened to be correct but using a single touching or crossing to stop a traveling car is unreasonable because such conduct is not a violation of West Virginia law. I suspect that nearly every person who has ever operated a motor vehicle has touched the white fog line.

Defendant points the Court to a number of non-binding decisions that have held that a single fog line crossing is insufficient to create probable cause. *Rowe v. State*, 769 A.2d 879 (Md. 2001); *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (isolated incident of car temporarily crossing the white line separating the emergency lane from the right-hand traffic lane insufficient to support a traffic stop); *United States v. Gregory*, 79 F.3d 973, 978 (10th Cir. 1996) (holding that an isolated incident of a vehicle crossing into the emergency lane of a roadway does not violate state statute's requirement that vehicles remain entirely in a single lane "as nearly as practical"); *State v. Cerny*, 28 S.W.3d 796, 800–01 (Tex. App. 2000) (holding a traffic stop invalid where the car drove on a portion of white shoulder stripe and was weaving somewhat within its own lane of traffic); *Hernandez v. State*, 983 S.W.2d 867, 870–71 (Tex. App. 1998) (car briefly drifted into adjacent traffic lane and back); *State v. Tarvin*, 972 S.W.2d 910, 912 (Tex. App. 1998) (car drifted over the solid white line at the right-hand side of the road on two or three occasions); *Crooks v. State*, 710 So. 2d 1041, 1042–43 (Fla. Ct. App. 1998) (car drove over the right-hand line on the edge of the road); *State v. Bello*, 871 P.2d 584, 587 (Utah Ct. App. 1994) (car

temporarily drifted so that it straddled both eastbound lanes of traffic)). I am persuaded by the reasoning in these cases and hold that a single fog line crossing is insufficient, without more, to create probable cause when the statute merely requires that a vehicle be driven within a single lane of traffic "as nearly as practicable."

### B. Was Deputy Thompson's traffic stop supported by a reasonable suspicion of criminal activity afoot?

i. *Reasonable suspicion of a traffic violation*

Having found that Deputy Thompson was without probable cause to pull Womack over, I must determine if he observed "articulable facts indicative of criminal conduct" that would justify an investigatory stop. *Wardlow*, 528 U.S. 119, 123–24 (2000). As I explained above, the reasonable suspicion standard is a lower bar to clear than probable cause. Furthermore, it is not to be conflated with probable cause in the context of a vehicle stop: "'the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred,' *or* 'a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *Sokolow*, 490 U.S. at 7 (1989)(emphasis added). The reasonable suspicion standard has its roots in *Terry*, which allows the police to stop and briefly detain a person for preemptive, investigative purposes. *Id*. (discussing *Terry*, 392 U.S. 1, 30 (1968)). In evaluating the validity of a stop supported only by reasonable suspicion, the court must look at the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417 (1981) ("The process does not deal with hard certainties but with probabilities."). Even under this less demanding standard, the officer must be able to articulate some suspicious conduct that rises to more than a hunch. *Terry*, 392 U.S.

at 27. "The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *Sokolow*, 490 U.S. at 7 (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

In this case, Deputy Thompson's stated reasoning for following Womack in the first place was that he observed Womack driving with his seat reclined, his arms locked out at "10 and 2," and his head obscured by the vehicle's B-pillar[1]. I am unpersuaded that even when considering these factors in conjunction with one another, that Deputy Thompson has offered an objective, articulable justification for his suspicion that criminal behavior was afoot. The Deputy characterized Mr. Womack's behavior as hiding from the police. Moreover, Deputy Thompson noted Womack's out of state plates and his presence on a known drug route. All of that may be true. But there are simply too many innocent explanations for why a person might maintain such a posture while driving: their height, their comfort, the design of the vehicle and so forth. The basis upon which Deputy Thompson rested his suspicions do not serve to "eliminate a substantial portion of innocent travelers" who may position their seats in the same way that Womack did on the night he was arrested. *Foreman,* 369 F.3d at 781. I therefore find that Deputy Thompson did not have a reasonable suspicion of criminality that warranted a detention.

Because I have found that the May 24, 2020 stop was unreasonable from its inception, the evidence seized during the subsequent warrantless vehicle search is subject to the exclusionary rule. Evidence gathered as fruit of an unreasonable search

---

[1] This is the term that parties use to describe the solid vertical line that forms at the midline of a sedan. It is the "seam" where the front and back doors meet.

or seizure is generally inadmissible against a defendant. *See Taylor v. Alabama*, 457 U.S. 687 (1982). I recognize that suppression is a harsh remedy that requires prosecutors to disregard key physical evidence. But the protections of the Fourth Amendment must be robust enough to limit warrantless searches to those instances in which law enforcement observes a crime or actual traffic violation or at least has a concrete basis for his suspicions of criminal activity. None of that was present in this case and I therefore must **GRANT** the Motion to Suppress.

III. CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress Evidence [ECF. No. 29] is **GRANTED**. The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER: July 1, 2020

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE